UNITED NEW JERSEY RAILROAD AND CANAL COMPANY AND PENNSYLVANIA RAILROAD COMPANY, PROSECU- TORS, v. NATIONAL DOCKS AND NEW JERSEY JUNCTION CONNECTING RAILWAY COMPANY.

1.  By the terms of the General Railroad law, a company organized there- under may condemn the "located route" of an existing railroad only for the purpose of crossing the same, and where a petition of such a company for the appointment of commissioners shows that it seeks to condemn a part of such a route generally, and not merely for the pur- pose of crossing, an order made thereon will be set aside.
2.  The survey of the route of the railroad filed in the office of the secre- tary of state limits the right of condemnation to the lands included in its description properly construed, and where a petition contains a de- scription of the lands sought to be condemned, and that includes lands not covered by the survey, an order made thereon cannot be sustained.
3.  The General Railroad law does not authorize a company organized thereunder to adopt a plan of crossing an existing railroad which will compel an alteration of its grade in order to its continued operation; but the crossing authorized to be acquired by condemnation is one where the previously existing use of the spot as a railroad continues in co-operation with the use by the new railroad.
4.  Such a crossing will be effected by a tunnel, an overhead bridge, or a passage across the rails at grade.

*Certiorari* bringing up an order appointing commissioners to condemn, and the petition whereon the same was made.

Argued at June Term, 1889, before Justices REED, MAGIE and GARRISON.

For the prosecutors, *J. B. Vredenburgh* and *Jos. D. Bedle.*

For the defendants, *John R. Emery* and *Gilbert Collins.*

The opinion of the court was delivered by

MAGIE, J.    This *certiorari* has brought before us the ap- plication of the National Docks and New Jersey Junction Connecting Railway Company (which will for brevity be

called the Connecting Railway Company) for the appointment of commissioners to condemn land for the railroad of applicants, and the order appointing commissioners thereon.

Numerous objections to the proceedings have been made by the United New Jersey Railroad and Canal Company and the Pennsylvania Railroad Company, who are prosecutors of the writ.

To make clear the questions raised by the objections which have been considered, it seems necessary to state the following facts, which appear from the return or the affidavits taken under a rule:

The Connecting Railway Company became incorporated under the General Railroad law. On December 10th, 1888, they filed a survey of the route and location of a railroad they proposed to build. The location was defined by a centre line, specifically described, on each side of which thirty-seven and a half feet were proposed to be included. The centre line may be generally stated as commencing at a point on the route of the National Docks Railway Company and running to a point on the route of the New Jersey Junction Railroad Company.

The described location passed from south to north over lands and railroads owned by one and leased and operated by the other prosecutor. In passing north, it first crossed the old main line of the railroad at a point east of the Bergen cut; then lands of prosecutors lying between that line and the present main line of the railroad; then the present main line of the railroad at a point east of the cut through Bergen hill; then lands lying between the present main line of the railroad and the line of freight tracks which, emerging from Bergen hill and curving somewhat to the north, runs on an elevation to Harsimus cove, and the location terminates on the route of the New Jersey Junction Railroad Company.

The last course of the centre line is thus described: "thence curving to the left on a radius of $573\,7/10$ feet a distance of 140 feet to station 25+94.8 to a point on the line of the railroad of the New Jersey Junction Railroad Company, be

the said distance more or less, said point being the point of departure of Branch Railroad No. 7 of last mentioned railroad company, as filed March 2d, 1886, in the secretary of state's office."

It appears that the old main line above mentioned, though not now used, has never been abandoned, and prosecutors design to utilize it·in connection with a projected yard for the storage of passenger cars when not running.   Prosecutors, under legislative sanction, have contracted to elevate their main line through Jersey City to the ferry.   Such elevation will necessitate the abandonment of the yard now used to store such cars, and to make a yard for that purpose in some convenient place.   The design of prosecutors· is shown to be to use the lands between the old main and the present main line and Bergen hill for that purpose, and they have been engaged in preparing it by removing portions which were above and filling portions which were below a convenient grade.

Upon the present main line the whole passenger traffic and some freight traffic is conducted.

The lands between that line and the Harsimus freight line are meadow lands, partially filled.

The New Jersey Junction Railroad Company have located a railroad running from a point in the township of Weehawken south to and across the lands and railroad of prosecutors. They have only constructed so much of the main line thereof as crosses the Harsimus freight line and extends a very short distance beyond.   The crossing is below the freight line, which passes by a bridge supported by abutments.   The Junction company have also located and constructed a branch called Branch No. 7, which ·diverges from the main line about where it emerges from the said abutments, and curving to the east makes a connection with prosecutors' main line of railroad.

The application of defendants makes known the rights they seek to obtain over prosecutors' lands and railroad, thus:

1.  The centre line of the strip proposed to be affected is described by courses and distances, commencing at the south

and running north, the last course being thus set forth: "thence curving to the left on a radius of $573 \, 7/10$ feet a distance of 140 feet to station 25+94.8 of said centre line, the last mentioned station being a point on the route of the New Jersey Junction Railroad, as filed in the office of the secretary of state."

2. It proposes to cross so much of prosecutors' property as lies south of the northeasterly side of the present main line by an open cut, walled on each side with walls of a specified thickness and height, which cut will pass through the embankment, roadbed and rails of the old main line, and the walls will rise at that point more than eight feet above the grade of that line; the walls at the crossing of the present main line will correspond in height with walls on which the bridge of that line is now supported. The top of the proposed wall will be in a straight line between the heights at the old main and the present main line.

By this plan defendants' road passes below the present main line without disturbing it. But if walls are built as proposed, prosecutors, if they desire to utilize the old main line or to establish the intended yard for passenger cars, must elevate the grade of the track and lands to correspond with these walls.

Much evidence has been taken as to the effect of such a change of grade. On one hand, it is contended that it is shown that a yard for passenger cars cannot safely be maintained and operated under the changed conditions. On the other hand, it is claimed that the yard may be established and operated at the changed grade with safety. Plans presented to show that it may be so done indicate, however, that prosecutors will be required to change the grade of the main line from that designed in the proposed elevation.

3. As to so much of said lands as lie northerly of the present main track, it is stated that defendant "requires and desires to acquire a width of twenty-seven and a half feet on each side of its said centre line, except at or near the extreme northerly end thereof, where it requires thirty-seven and a

half feet in width on the easterly side of said centre line." The land so required is then described by metes and bounds. From this description it appears that the west twenty-two and a half feet of the width at the north end of the tract does not adjoin the New Jersey Junction Railroad, but abuts on lands of prosecutors. The remaining width extends over eighteen feet farther north and beyond the southeast corner of the west abutment of the Harsimus line.

The right of the Connecting Railway Company to the condemnation it has thus sought must have been obtained, if obtained at all, from the provisions of the General Railroad law, under which it obtained its corporate powers.

This act, as originally passed or as since amended, does not contain any express grant of power to a corporation incorporated under its provisions to cross the railroad and lands of a previously incorporated railroad company. Special charters which authorized the construction of a railroad between two specified points had, however, then been judicially determined to give, by implication, sufficient authority to cross the road of intervening railroads and to condemn a right to thus cross. It was therein held that no express grant was necessary. *Morris and Essex R. R. Co.* v. *Central R. R. Co.*, 2 *Vroom* 205 ; *National Railway Co.* v. *Easton and Amboy R. R. Co.*, 7 *Id.* 181. It is apparent that the express grant contained in the General Railroad law to any corporation organized thereunder of a right to build a railroad between such points as such corporation shall select agreeably to the terms of the act, will justify a like implication ; and it is equally clear that the legislature designed to thus authorize the crossing of intervening railroads, because, by the thirty-sixth section of the original act, provisions were made respecting such crossings. That such a right exists by virtue of the provisions of the law in question, has been recognized in the Court of Errors and in this court, and cannot now be questioned. *Morris and Essex R. R. Co.* v. *Hudson Tunnel*, 9 *Vroom* 548 ; *Lehigh Valley R. R. Co.* v. *Dover and Rockaway R. R. Co.*, 14 *Id.* 528, 532.

The thirty-sixth section of the General Railroad law contains provisions regulating and to some extent restricting the right of a railroad incorporated thereunder in crossing another railroad. The section has been frequently amended, but the provisions to which I allude have remained unchanged. *Rev. Sup.*, p. 827, *pl.* 18. These provisions are thus expressed: " Provided, further, that no corporation organized under this act shall be authorized to take, use or occupy by condemnation any lands belonging to the State of New Jersey, or any franchises, lands or located route of any bridge, railroad, canal, turnpike or other corporation chartered for the purpose of facilitating transportation, except for the purpose of crossing said lands or route of said corporation, and except the lands of such other corporations not necessary for the purposes of their franchises ; and provided, further, that a railroad may be located or constructed under this act on the surveyed routes or location of any other railroad, with the consent of such corporation and not otherwise."

These curiously mingled positive and negative provisos and exceptions upon exceptions were considered by Van Syckel, J., in *Morris and Essex R. R. Co.* v. *Hudson Tunnel R. R. Co., supra,* and their meaning determined so far as was essential to the case before the court. The case now in hand requires a fuller statement of their meaning. The following, which is in accord with the views of that learned justice as far as he deemed it necessary to express them, shows, in my judgment, the true construction of these provisions: (1) Lands of railroad companies not necessary for the purposes of their franchises may be taken and condemned without restriction. (2) Other lands and also the located routes of such companies may be taken and condemned for the purpose of crossing the same and no other purpose, and to that extent franchises may also be taken and condemned. (3) There can be no location or construction of a railroad on the surveyed routes and location of another railroad except by consent, but this prohibition does not refer to the location or construction of a mere crossing.

The statute, in these provisions, recognizes, therefore, a distinction between the rights which a new company, projecting a railroad across another railroad already established, may acquire. As to lands not necessary for the purposes of the franchises of the latter road, condemnation may be had in the same mode and with the same effect as the condemnation of lands of private individuals. As to other lands, the possible acquisition is limited to a right of crossing.

The application of defendant is made in accordance with this distinction. Over a portion of the course on prosecutors' property it demands a right of crossing by an open cut. Over the remainder it seeks to acquire a tract described by metes and bounds, and its demand is precisely such as is made when the condemnation of lands of any private person is sought.

The first objection which has been considered is one which challenges defendants' right to thus condemn the specific tract so described.

It is first contended that, since the right thus to acquire lands of another railroad company is expressly limited to such lands as are not necessary for the purposes of its franchises, the fact that the lands sought to be condemned generally are not necessary for such purposes is jurisdictional, and should appear in the proceedings.

It is next insisted that the evidence shows that all the lands in question are necessary for the purposes of its franchises. Although not now used for such purposes, it is claimed that they have been purchased and will be required in the future for those purposes, and may therefore be considered as necessary for such purposes within the principles laid down in *Morris and Essex R. R. Co.* v. *Haight*, 6 *Vroom* 40.

It is lastly urged that, if the last point is left in doubt by the evidence, there is proof that some part of this tract cannot be thus taken.

The last contention has been deemed so plainly correct that it has not been thought necessary to express any opinion upon the others.

The freight line to Harsimus cove was located under an "Act to enable the United Railroad and Canal Companies to increase their depot and terminal facilities at Jersey City," approved March 30th, 1868, and a route of one hundred feet in width was authorized to be located and a railroad built thereon.    This, then, was the located route of a railroad over which defendants' right is limited to a mere crossing.    The evidence and exhibits make it plain that the described tract encroaches upon this located route.    The petition seeks to acquire so much of that route in general terms for the general purposes of defendants' railroad, and not merely for a crossing.    The act does not authorize such a condemnation.

It is settled that where a petition seeks to condemn more land than the petitioner is authorized to take by condemnation, and avers inability to agree for the purchase of the whole lands, the proceedings cannot be sustained.    *Central R. R. Co.* v. *Hudson Terminal Ry. Co.*, 17 *Vroom* 289.

Another objection to this proceeding is put on the ground that the tract described in the petition extends over prosecutors' lands beyond the route of defendants' railroad, as described in the survey and location filed in the office of the secretary of state.

The scheme of the act with respect to the lands which may be condemned is not open to doubt.    A franchise to construct a railroad is given to every corporation formed thereunder between the points named in the articles of association.    But the road may not be constructed nor may lands be condemned until the location of the route has been determined on and a survey thereof has been filed.    Thereupon the franchise, general before, becomes operative in the limits of that location and not elsewhere.

The location so determined upon must be discovered from the filed survey.    This affords the only evidence of the grant to the corporation.    Where the only question raised on such a survey relates to the description of the route, the ordinary rules of construction applied to private grants are applicable, such as—the whole description must be read together, and with

it any other description which by reference is made part thereof; every clause of the description must be given effect to, if it can be reasonably done; if two clauses are irreconcilable, that must be adopted which will effectuate the intent shown by the instrument, which should be effectuated, if a ·reasonable construction will do so.·

The dispute raised by this objection relates to the north end of the tract in question, which is intended to be at the north end of the located route. Defendants contend that the tract in question lies wholly within the located route. Prosecutors contend that it includes a triangular piece of land lying west of the located route.

Where the located route extends will be determined by fixing where the last course of the description runs and measuring the prescribed width on each side. That course is described as on a curve with a specified radius, for a specified distance, but this description is qualified by a statement that the distance may be more or less, and by the further statement that it runs to a point in the line of the New Jersey Junction Railroad, which is the point of departure of Branch Railroad No. 7 of last mentioned railroad company, as filed March 2d, 1886, in the secretary of state's office.

There is no monument on the ground fixing the point of departure spoken of. When a branch route having width ·diverges from a main route also having width, there can hardly be said to be a *point* of departure. But the description before us evidently refers, not to a point to be mathematically ascertained, but to one indicated in the instrument filed on the date named. On that day the New Jersey Junction Railroad Company filed a survey of its location of its main line, and also of Branch No. 7. Both are described by means of centre lines, the courses and distances of which are given. The point where the centre line of that branch departs from the centre line of the main route is designated, and forms part of the description in the survey. Reading the description before us with this survey to which it refers, it seems to me not to admit of doubt that the point of departure

mentioned was the designated point where such centre lines joined.

But this point is not that to which the given course and distance will extend, nor will it be reached by that course. There is, then, a plain inconsistency between these two clauses of description, and both cannot be followed. It is obvious, that in determining which should govern, effect, if possible, must be given to the apparent intention of the parties. Thus monuments prevail over courses and distances when inconsistent, because the party is held to intend that description which may be located with no liability to error, rather than that notoriously liable to error.

The intent of this location is made plain by the survey. It was to connect the railroad of the National Docks Railway Company with that of the New Jersey Junction Railroad Company by a route of seventy-five feet in width.

If the centre line in question is carried to the point fixed by the course and distance, over twenty-seven feet of the width does not abut upon the route of the New Jersey Junction Railroad.

If it is carried to the point of departure above mentioned, as indicated on the filed survey of that company, the whole seventy-five feet of width would abut on and join the route of that railroad. The latter would make a perfect, the former only a partial, connection.

The intent of the party can only be effectuated by running the course to the point of departure above indicated, and the description must, in my judgment, be so construed.

Defendants' petition first described the tract to be condemned by running its centre line. The courses described agree with those of the filed survey, except that the last course, while using the same radius of curvature and the same distance, runs to a " point on the route of the New Jersey Junction Railroad Company as filed in the office of the secretary of state," and omits the reference to the point of departure of Branch No. 7. Using the last course and distance a point is reached within the route of that railroad. The de-

scription is, therefore, perfect in itself. It contains no inconsistent clause, and we are not justified in varying the line and ending thus called for.

The other description of the tract in the petition is by metes and bounds, and it corresponds with the centre line as above construed.

If, then, the location of defendants' route as shown by the filed survey be laid down in the manner above indicated to be correct, and the description of the petition, read according to its terms, be compared therewith, the latter extends on the west beyond the lines of the former, and therefore includes and seeks to condemn lands not within the location.

This objection is, therefore, also fatal to the proceeding.

The only other objection which has been considered raises a question of great importance.

The acquisition by defendants of the rights they seek will, as has been seen, compel prosecutors either to abandon some of their located routes and some lands which are fairly necessary for the purposes of their franchises, or to adapt them to defendants' plan by an alteration of their grades. The old main line and the lands designed for a yard for cars must be made to correspond in grade with defendants' walls and open cut. If the yard be there constructed, it seems evident that both safety and convenience will require prosecutors to change the grades of the present main line.

The plan which produces these results has not been adopted by the concurring judgments of the corporations interested as a device for crossing which will occasion the least injury and inconvenience to each. It has been determined on and adopted by defendants.

It may be that the plan before us does the least possible injury. But defendants' contention is, that the General Railroad law has endowed every company organized thereunder, and intending to construct its railroad across a previously existing railroad, with the right to adjudicate upon and determine the mode of crossing, and to demand and acquire a crossing according to that mode. They insist that considerations of

inconvenience and injury inflicted thereby on the existing railroad are not to be taken into account, for compensation for all injuries is required and must be presumed to be made. According to their interpretation of the act, the new company will keep within the limits of the powers granted so long as the mode of crossing which it has devised does not debar the existing railroad from discharging its duty to the public in transporting passengers and freight.

Is this the true interpretation of the act in this respect?

In considering this question, it is to be remembered that if one construction of an act will produce results which must have been anticipated, and which are not only injurious, but inconsistent with the general intent of the act, and another and reasonable construction will avoid such results, the latter should be adopted.

The intent of the General Railroad law cannot be in doubt. Power to build railroads, in any direction and between any points where capital in good faith desires to build, is given in ample terms. Yet it is clearly shown that such roads are not to take the place of existing railroads or usurp their functions. The plain design was to foster all railroad enterprises, so as to prevent monopoly, to encourage competition and to furnish the freest facility for the public service by railroads.

In some legislative schemes in other states, such crossings are required to be passed upon by some tribunal, and to be constructed in accordance with a plan adopted by it after hearing the parties. Such a scheme, it is obvious, has many advantages over that which permits one railroad to select and enforce its own plan of crossing, however injurious. The tribunal would select a plan which would occasion the least injury and inconvenience to each road. Moreover, its adjudication would not only afford a definite basis on which an award for compensation could be made with reasonable accuracy, but would also furnish most useful evidence of the rights acquired and burdens imposed by the condemnation.

But no such tribunal has been created by this statute. This court has not been endowed with such powers. We

may not interfere with a crossing and compel the adoption of a plan which we deem most convenient to each railroad. We may not forbid a crossing the plan of which produces unnecessary injury, which could be avoided by a reasonable concession. If the interpretation of the act claimed by defendants is correct, we may only interpose when the crossing proposed practically deprives the railroad crossed of running its cars. For all evils, less in extent, occasioned by the plan adopted by the new company, the previously existing company can obtain no relief by way of a modification or alteration thereof.

Yet it is quite apparent that, under the construction claimed, a company organized under this act, whose railroad when finished will compete for traffic with an existing railroad, may so cripple the latter road by a crossing as to destroy its competition. It would only be necessary to devise a plan which, while not debarring the continued use of the railroad, would render such use so difficult and costly that passengers and shippers would be driven to avoid it. No effort of the imagination is required to perceive how seriously the public interests which this act was designed to advance may thus be injured.

The act also provides that when an award has been made the money awarded may be tendered, and the applying company may thereupon at once proceed to exercise the rights acquired. In every case of a crossing such as that here proposed, it will doubtless occur that many devices for accommodating the old road to the changed circumstances will be possible. Some will be more convenient and costly, others less so; yet, until the award, the plan or device adopted as the basis of compensation cannot be known. The company affected cannot re-arrange its grades until it knows how it is to be compensated. It must therefore risk the interruption of its traffic by the new road cutting through its route. It may be that a court of equity could interfere to stay such proceedings, but it is difficult to see on what principle its interposition could be justified, and the fact that the act makes no provision to prevent what would evidently produce public

injury, may be considered in determining the meaning and intent of the act.

That compensation is required to be made for all such injuries does not, in my judgment, dispose of these objections. The stockholders of the injured railroad are thereby indemnified for their losses. The act before us had other aims than the protection of stockholders. It was designed as well to benefit the public by continuing existing and creating new agencies to serve the public in transportation from place to place, and the functions of these agencies were not to be interrupted or so crippled as not to be capable of being used in fair competition.

If the construction of the parts of the act in question produces results inconsistent with this design, it must be viewed with doubt. If another construction, in itself reasonable, will avoid such results, it should be applied.

There is a reasonable construction of the clauses in question from which no inconsistent results arise.

The statute provides that the lands and located route of an existing railroad may be condemned solely for the purpose of crossing the same. The rights acquired therein are not such as are acquired in the lands of other persons by condemnation. On the contrary, the act recognizes railroad property of this kind as already devoted to one public use and authorizes it, as so devoted, to be burdened by another public use. Therefore the latter may not exclude the former use, but must be such as can be superimposed on it and exercised in common with it. *New Jersey Southern R. R. Co.* v. *Long Branch Comrs.*, 10 *Vroom* 28; *Lehigh Valley R. R. Co.* v. *Dover and Rockaway R. R. Co.*, 14 *Vroom* 528. The crossing intended by the act must therefore be one where the original use as exercised at the point of crossing may be continued in concurrence and co-operation with the new use. Such a crossing will be effected by a tunnel which leaves the surface intact and provides support for the use it has been applied to; or by an overhead bridge at such a height as not to interfere with the free use of its route by the existing railroad; or by a passage

on the surface and at grade, where the rails of the existing railroad are temporarily cut and frogs inserted which thereafter permit the continuous use of the route by the existing railroad, except when the trains of the new railroad are crossing.

But to sever the roadbed and rails of an existing railroad, to divide its route by a cut or a fill which can only be passed by raising or lowering its grade, is not, in my judgment, a crossing within the meaning of the act.    It is rather a division of the existing railroad into two unconnected parts, which it can only make continuous by its effecting a crossing of the new railroad.

Under this construction, no railroad can be crippled or interrupted to the public detriment.

On this view of the act the petition seeks to acquire across the located route of prosecutors rights which the act does not permit them to acquire by condemnation, and the order, for this reason, cannot be sustained.

Other objections raise questions of much interest, notably that objection which denies the right to make any crossing through or over lands devoted to the storage of cars.    But time has not permitted their examination.

For the reasons above given the order must be set aside.